**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

TAI LOONG HONG MARINE
PRODUCTS, LIMITED,
      *Claimant-Appellant,*

      v.

APPROXIMATELY 64,695 POUNDS OF
SHARK FINS,
      *Defendant-Appellant.*

No. 05-56274

D.C. No.
CV-03-00594-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
May 14, 2007—Pasadena, California

Filed March 17, 2008

Before: Stephen Reinhardt, Raymond C. Fisher, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Reinhardt

2471

**COUNSEL**

Bryan Y.Y. Ho, Esq., Honolulu, Hawaii, for the defendant-appellant.

Carol C. Lam, Esq., Roger W. Haines, Jr., Esq., Mary C. Lundberg, Esq., United States Department of Justice, San Diego, California, for the plaintiff-appellee.

**OPINION**

REINHARDT, Circuit Judge:

This case arises from a civil complaint brought by the U.S. Government for the forfeiture of 64,695 pounds of shark fins found on board the *King Diamond II* ("*KD II*"), a United States vessel. Claimant-Appellant Tai Loong Hong Marine Products, Ltd. ("TLH") owned the shark fins. TLH, a Hong

Kong company, had chartered the *KD II* and ordered it to meet foreign fishing vessels on the high seas, purchase shark fins from those vessels, transport the fins to Guatemala, and deliver them to TLH. The Government seized the fins pursuant to the Shark Finning Prohibition Act ("SFPA"), which makes it unlawful for any person aboard a U.S. fishing vessel to possess shark fins obtained through prohibited "shark finning." 16 U.S.C. § 1857(1)(P)(ii). TLH does not contest that, on its behalf, the *KD II* purchased the fins at sea from foreign vessels that engaged in shark finning. Instead, it argues that the *KD II* is not a fishing vessel under 16 U.S.C. § 1802(18)(B), and for that reason the forfeiture of the shark fins it possessed would violate due process. We agree that neither the statute nor the regulations provided fair notice to TLH that it would be considered a fishing vessel under § 1802(18)(B). We therefore reverse the judgment of forfeiture and remand for further proceedings consistent with this opinion.

## I.   Background

In 1976, Congress passed the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. § 1801 *et seq.*, to conserve and manage fishery resources. 16 U.S.C. § 1801(b)(1). In 2000, Congress enacted the Shark Finning Prohibition Act, which amended the Magnuson Act in an attempt to eliminate the practice of shark finning. Pub. L. No. 106-557, 114 Stat. 2772 (2000), 16 U.S.C. § 1857(1)(P).

The SFPA makes it unlawful:

> (I) to remove any of the fins of a shark (including the tail) and discard the carcass of the shark at sea;

> (ii) to have custody, control, or possession of any such fin aboard a *fishing vessel* without the corresponding carcass; or

(iii) to land any such fin without the corresponding carcass.

16 U.S.C. § 1857(1)(P) (emphasis added).[1]

The Magnuson Act, in turn, defines a fishing vessel to include

"any vessel, boat, ship, or other craft which is used for, equipped to be used for, or of a type which is normally used for —

(A) fishing; or

(B) aiding or assisting one or more vessels at sea in the performance of any activity relating to fishing, including, but not limited to, preparation, supply, storage, refrigeration, transportation, or processing."

16 U.S.C. § 1802(18).

The question we must resolve is whether TLH had notice that the *KD II*'s activities would fall within the definition of fishing vessel in § 1802(18)(B) and thus render it subject to the prohibition on possessing shark fins under the SFPA. The *KD II* is a United States vessel owned and operated by Tran & Yu, a Hawaii corporation. Tran & Yu purchased the *KD II* in January 2001. Although Tran & Yu initially registered the vessel with a "Fishery" endorsement,[2] the company re-

---

[1] The SFPA establishes a "rebuttable presumption that any shark fins landed from a fishing vessel or found on board a fishing vessel were taken, held, or landed in violation of subparagraph (P) if the total weight of shark fins landed or found on board exceeds 5 percent of the total weight of shark carcasses landed or found on board." 16 U.S.C. § 1857(1).

[2] A fishery endorsement entitles a vessel to work in fisheries and land its catch in United States ports. *See* 46 C.F.R. § 67.21(a). *See also* 46 C.F.R. § 67.3 ("Fisheries includes processing, storing, transporting (except in foreign commerce), planting, cultivating, catching, taking, or harvesting fish, shellfish, marine animals, pearls, shells, or marine vegetation in the navigable waters of the United States or in the Exclusive Economic Zone.").

documented the vessel with a "Registry" endorsement, which "entitles a vessel to employment in the foreign trade . . . and any other employment for which a coastwise, Great Lakes, or fishery endorsement is not required." 46 C.F.R. § 67.17(a). During the time of the transactions at issue in this case, the *KD II* operated under this registry endorsement.

TLH is a Hong Kong company that purchases and sells seafood products, including shark fins. TLH chartered the *KD II* and ordered it to make a voyage in which it would rendezvous with foreign fishing vessels on the high seas, purchase shark fins from those vessels, and transport the fins to Guatemala, where TLH would accept delivery.

In June 2002 the *KD II* left Honolulu, Hawaii, to begin the charter trip for TLH. During the next two months, the *KD II* met with over 20 vessels on the high seas and purchased approximately 64,695 pounds of shark fins. On August 14, 2002, United States Coast Guard officials boarded the *KD II* approximately 250 miles off the coast of Guatemala. On board, they discovered the shark fins but no shark carcasses. The SFPA establishes a rebuttable presumption that shark fins landed or found on board a fishing vessel without corresponding shark carcasses were obtained through prohibited shark finning. 16 U.S.C. § 1857(1)(P). Acting on this presumption, the Coast Guard detained the *KD II* and escorted it to San Diego. On August 23, 2002, the Government seized the shark fins.

On March 26, 2003, the Government filed a civil complaint for forfeiture of the shark fins. The complaint alleged that the fins were subject to forfeiture pursuant to the Magnuson Act, 16 U.S.C. § 1860(a), because they were taken or retained in violation of the SFPA, 16 U.S.C. § 1857(1)(P)(ii), and its implementing regulations at 50 C.F.R. § 600.1203(a)(2) (formerly 50 C.F.R. § 600.1022(a)(2)). This is referred to herein as the "possession" prohibition. The landing prohibition, set forth in the following subsection of the statute, subsection

(iii), is not at issue here, because "landing" applies only to landings at U.S. ports.

The issue in dispute is whether the *KD II* was a fishing vessel within the meaning of the SFPA and the Magnuson Act. The district court ruled on two separate arguments advanced by TLH. It first held that there was a genuine issue of material fact about whether the *KD II* was "used for, equipped to be used for or of a type which is normally used for . . . fishing" as defined in § 1802(18)(A), and it therefore denied summary judgment as to that ground. The court then held that the *KD II* was a fishing vessel as a matter of law under § 1802(18)(B) because it aided or assisted fishing vessels at sea in the performance of activities related to fishing, including "purchase, storage, and transportation." As a result, the court granted the government's motion for summary judgment on that basis. *See United States v. Approximately 64,695 Pounds of Shark Fins*, 353 F. Supp. 2d 1095 (S.D. Cal. 2005). The parties then filed an Amended Stipulated Facts and Legal Conclusion "for the purpose of saving the time and cost of litigating the fair market value of the shark fins, as well as to expedite TLH's appeal of an order forfeiting the fair market value of the shark fins to the Ninth Circuit Court of Appeals." The parties stipulated that the fair market value of the fins at the time of the seizure was $618,956 and that an order forfeiting this amount was a legal consequence of the district court's summary judgment order.

The district court entered a judgment of forfeiture on June 6, 2005. TLH timely appealed.

## II. The statutes and regulations did not provide TLH with notice that the prohibition on possessing shark fins aboard a fishing vessel as defined in 16 U.S.C. § 1802(18)(B) applied to the *KD II*

TLH challenges the district court's ruling, arguing both that the *KD II* was not a fishing vessel within the meaning of 16

U.S.C. § 1802(18)(B), and that application of that provision of the SFPA to the *KD II* violated due process. Even if the *KD II* were a fishing vessel within the meaning of § 1802(18)(B), we conclude that the provision in question would not provide fair notice to TLH that it was such a vessel and was subject to the possession prohibition. As a result, we agree that application of that sub-section of the SFPA to the *KD II* violated due process.

## A.    Fair notice

[1] Due process requires that an agency provide "fair notice of what conduct is prohibited before a sanction can be imposed." *Stillwater Mining Co. v. Federal Mine Safety & Health Review Comm'n*, 142 F.3d 1179, 1182 (9th Cir. 1998) (quoting *Newell v. Sauser*, 79 F.3d 115, 117 (9th Cir. 1996)). As the D.C. Circuit has explained, "[i]n the absence of notice — for example, where the regulation is not sufficiently clear to warn a party about what is expected of it — an agency may not deprive a party of property by imposing civil or criminal liability." *Trinity Broadcasting of Florida, Inc. v. Federal Commc'n Comm'n*, 211 F.3d 618, 628 (D.C. Cir. 2000) (quoting *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995)) (alteration in original).

[2] To provide sufficient notice, a statute or regulation must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). We agree with TLH that a reasonable owner of a cargo vessel engaged in at-sea purchase and transfer of shark fins would not anticipate that its ship could be deemed a fishing vessel under § 1802(18)(B).

### 1.    Plain Language of the Statute

In determining the meaning of a statute, we first look to the language of the statute itself. *See Freeman v. DirecTV, Inc.*,

457 F.3d 1001, 1004 (9th Cir. 2006) ("The starting point for [the] interpretation of a statute is always its language.") (quoting *Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 739 (1989)). In this case, we find nothing in the plain meaning of § 1802(18)(B) that would provide notice to the owners of the *KD II* that its activities would render it a fishing vessel under § 1802(18)(B).

**[3]** The district court found the *KD II* in violation of the SFPA, which prohibits the possession of unlawfully obtained shark fins aboard a fishing vessel. 16 U.S.C. § 1857(1)(P). As explained above, the SFPA relies on the Magnuson Act to define the term "fishing vessel." The definition includes any vessel that "aid[s] or assist[s] one or more vessels at sea in the performance of any activity relating to fishing, including, but not limited to, preparation, supply, storage, refrigeration, transportation, or processing." 16 U.S.C. § 1802(18)(B).

The district court held that the *KD II* was a fishing vessel under 16 U.S.C. § 1802(18)(B) because it aided and assisted vessels at sea in the performance of fishing-related activities. Specifically, the district court found that the *KD II*'s "purchase, storage, and transport" of the shark fins aided and assisted the foreign fishing vessels.

**[4]** None of these activities would appear to fall within the plain meaning of "aiding" or "assisting" in the circumstances of this case. The American Heritage Dictionary of the English Language defines "to assist" as "[t]o give help or support to, especially as a subordinate or supplement; aid." *American Heritage Dictionary of the English Language* (4th ed. 2000). Similarly, it defines "to aid" as "[t]o help or furnish with help, support, or relief." *Id.* As these definitions indicate, "aiding" and "assisting" generally connote doing an act for the benefit of another.

**[5]** In this case, the charterers of the *KD II* did not purchase, store or transport shark fins for the benefit of the for-

eign fishing vessels. Instead, they purchased the fins for their own commercial purposes. The foreign fishing vessels had no interest in the shark fins after selling them to the *KD II.* As a result, the *KD II*'s subsequent post-purchase storage and transport of the shark fins did not benefit the foreign vessels any more than the purchaser of any other product aids and assists the seller by storing the goods it has acquired in a warehouse or transporting them to the location at which it intends to resell them. Nor does the mere act of purchasing constitute an act of aiding and assisting a seller. Otherwise it would not be necessary in criminal statutes that are intended to punish buyers as well as sellers of illegal substances to specify the former group expressly. It would be enough that selling is proscribed and that a purchaser bought the illicit product. Under the district court's theory, the simple act of purchasing would make a buyer an aider or abettor. This is simply incorrect. Moreover, here, unlike storing and transporting, "purchasing" is not listed in the statute as one of the acts that constitutes aiding and abetting. Under these circumstances, the statutory provision that prohibits "aiding or assisting any activity relating to fishing" does not give fair notice that purchasing fins is prohibited, nor that storing or transporting them after they are acquired is contrary to law.

Similarly, we are not persuaded by the district court's reasoning that purchasing shark fins at particular at-sea locations designated by the foreign vessels constitutes an act of aiding or assisting the foreign vessels. As explained above, the acts of purchasing, and then storing and transporting the shark fins do not in themselves constitute aiding or assisting the fishing vessels. Rather, the charterers of the *KD II* were at all times acting for their own benefit, not for the benefit of the foreign fishing vessels. That the foreign vessels chose to conduct the sales at sea — even at particular locations at sea — and to transfer possession of the fins at that point, may have been beneficial or even necessary to those vessels' business operations, but the choice did not change the nature of the purchasers' actions in any respect. They still purchased the fins,

stored them and transported them for their own commercial purposes. From the standpoint of the purchaser, any benefit to the seller was incidental. In short, the statutory language at issue here does not support the district court's conclusion that the *KD II* became a fishing vessel because it purchased, transported and stored the shark fins at a location favorable to the foreign fishing vessels.

We also reject the district court's reasoning that the at-sea purchase of the shark fins constituted aiding and assisting because it allowed the foreign vessels to continue fishing for longer than they would have otherwise. The court supported this conclusion by referring to a letter stating that the *KD II* would save time and expense by having one of the foreign vessels pick up shark fins from other vessels and deliver them in bulk to the *KD II.* Although the letter relates the time and expense that TLH saved by not having to go from vessel to vessel in each instance, it does not establish that the failure or inability to make such arrangements with respect to all the foreign vessels constituted aiding or assisting those to which the *KD II* actually went. Surely, purchasing all the shark fins at the dock would have been preferable for TLH (if the cost were to remain the same), and surely the sellers benefited from selling at a particular location, just as they benefited from making the sale in the first place. Nevertheless, wherever the purchase is made, the purchaser is doing no more than making a purchase that it desires to make for its own business reasons. As a result, while the district court's assumption that the seller would benefit from the location of particular sales appears reasonable, it is irrelevant. Thus, nothing in the district court's reasoning persuades us that the plain language of § 1802(18)(B) provides fair notice that a purchaser of shark fins is aiding or assisting the seller by the act of purchasing.

We recognize that Congress enacted the SFPA to "eliminate the wasteful and unsportsmanlike practice of shark finning" and that it explained that "the purpose of this Act is to

eliminate shark-finning by addressing the problem compre-
hensively at both the national and international levels." Pub.
L. 106-557, 114 Stat. 2772 (2000). Although this broad state-
ment expresses an intent to prevent shark finning, it says
nothing to suggest that purchasing shark fins or subsequently
transporting or storing them for the purchaser's benefit consti-
tutes aiding or assisting the seller and, thus, falls within the
ambit of the possession prohibition. Given that the plain lan-
guage of § 1802(18)(B) nowhere suggests that the possession
prohibition extends to the activities of the *KD II*, the broad
purpose of the Act provides no help to the government with
regard to the issue on appeal.

Although we find nothing in the plain language of
§ 1802(18)(B) that would provide notice to the *KD II* that the
possession prohibition extended to its activities, we will next
turn to the regulations and to the district court's alternative
holding that they provide such notice.

## 2.  Implementing Regulations

The district court concluded that the implementing regula-
tions made clear that the actions of the *KD II* would render it
subject to the possession prohibition. We reject this holding
as well.

Pursuant to the SFPA, the National Marine Fisheries Ser-
vices (NMFS) enacted regulations making it unlawful to:

> 1) Engage in shark finning as provided in
> § 600.1204(a) and (I).
>
> 2) Possess shark fins without the corresponding car-
> casses while on board a U.S. fishing vessel, as pro-
> vided in § 600.1204(b) and (j).
>
> 3) Land shark fins without the corresponding car-
> casses, as provided in § 600.1204(c) and (k).

50 C.F.R. § 600.1203.

The relevant portion of the possession prohibition is defined at § 600.1204(b), which provides:

> No person aboard a U.S. fishing vessel shall possess on board shark fins harvested seaward of the inner boundary of the U.S. EEZ without the corresponding carcass(es). . . .

The relevant portion of the landing prohibition is defined at § 600.1204(c), which provides:

> No person aboard a U.S. or foreign fishing vessel (including any cargo vessel that received shark fins from a fishing vessel at sea) shall land shark fins harvested in waters seaward of the inner boundary of the U.S. EEZ without corresponding shark carcasses. . . .

As the government conceded at oral argument, the landing provision applies only to fishing vessels (and cargo vessels that receive fins from a fishing vessel at sea) landing at U.S. ports. It does not apply to those vessels landing at foreign ports, such as Guatemala, where the *KD II* was to land.

To support its conclusion that the regulations make clear that the *KD II* was a fishing vessel, the district court looked exclusively to the agency's explanation of the regulation prohibiting *landing* shark fins, the prohibition at 50 C.F.R. § 600.1204(c). The agency explained this provision in the preamble:

> The prohibition of *landing* shark fins without corresponding carcasses extends to any vessel (including a cargo or shipping vessel) that obtained those fins from another vessel at sea. Any such at-sea transfer of shark fins effectively would make the receiving

vessel a "fishing vessel," as the receiving vessel is acting "in support of fishing." Thus, the receiving vessel is prohibited from landing shark fins without corresponding carcasses under this final rule.

67 Fed. Reg. 6194 (2002) (emphasis added).

**[6]** Far from making clear that the *KD II* was a fishing vessel for purposes of the *possession* prohibition — the prohibition under which the government seized the shark fins aboard the *KD II* — the language relied on, in context, suggests the opposite. As TLH points out, the quoted language relates to the *landing* prohibition. While the text of the landing prohibition, 50 C.F.R. § 600.1204(c), explicitly provides that a cargo vessel that lands shark fins after an at-sea transfer is considered a fishing vessel, § 1204(b) — the prohibition on *possessing* shark fins — includes no such provision. Where an agency includes language in one section of the regulation and omits it in another, it is reasonable to presume that the agency acted intentionally in forgoing the language. *Cf. Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal citation omitted).

In other words, the text of the landing prohibition specifically includes cargo or shipping vessels such as the *KD II*, while the text of the possession prohibition contains no such language. The obvious implication is that although the landing prohibition defines vessels that simply engage in at-sea transfer of shark fins as fishing vessels, the possession provision does not.

**[7]** The preamble to the regulation similarly supports the conclusion that vessels engaged in the at-sea transfer of fins will be considered fishing vessels only for purposes of the landing prohibition. Again, the only reference in the preamble

to a prohibition on at-sea transfer of shark fins is found in the discussion of the landing prohibition; no such reference occurs in the discussion of the possession prohibition.

[8] Taken together, the regulations and the preamble may be reasonably read to provide notice that vessels that engage in at-sea transfers of fins are prohibited from landing shark fins in a U.S. port, but they do not provide notice that such vessels are prohibited from possessing fins for the purpose of making a delivery to a foreign port. This reading is further supported by the agency's emphasis in the preamble on its desire not to interfere with international trade. *See* 67 Fed. Reg. 6194, 6195 (2002). As TLH pointed out, the *KD II*'s purchase and delivery of shark fins to a foreign port for resale falls within the ambit of international trade. In the absence of any other indication in the statutes or the regulations, a vessel engaged in such trade has reason to believe that it is not subject to the possession prohibition as a fishing vessel under § 1802(18)(B).

[9] Under the circumstances, a reasonable person would not have fair notice that the activities of the *KD II* would render it a fishing vessel under § 1802(18)(B). As a result, we hold that the district court's application of the possession prohibition of the SFPA to the *KD II* as a fishing vessel under § 1802(18)(B) violated due process. We therefore reverse its decision and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**