**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| HAWAI'I WILDLIFE FUND, a Hawaii non-profit corporation; SIERRA CLUB - MAUI GROUP, a non-profit corporation; SURFRIDER FOUNDATION, a non-profit corporation; WEST MAUI PRESERVATION ASSOCIATION, a Hawaii non-profit corporation, *Plaintiffs-Appellees*, v. COUNTY OF MAUI, *Defendant-Appellant.* | No. 15-17447 D.C. No. 1:12-cv-00198-SOM-BMK ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Hawaii
Susan O. Mollway, Senior District Judge, Presiding

Argued and Submitted October 12, 2017
University of Hawaii Manoa

Filed February 1, 2018
Amended March 30, 2018

Before: Mary M. Schroeder, Dorothy W. Nelson,
and M. Margaret McKeown, Circuit Judges.

Order;
Opinion by Judge D.W. Nelson

## SUMMARY[*]

### Environmental Law

The panel filed (1) an order amending its opinion and, on behalf of the court, denying a petition for rehearing en banc; and (2) an amended opinion affirming the district court's summary judgment rulings finding that the County of Maui violated the Clean Water Act when it discharged pollutants from its wells into the Pacific Ocean, and further finding that the County had fair notice of its violations.

The panel concluded that the County's four discrete wells were "point sources" from which the County discharged "pollutants" in the form of treated effluent into groundwater, through which the pollutants then entered a "navigable water," the Pacific Ocean. The wells therefore were subject to National Pollutant Discharge Elimination System regulation. Agreeing with other circuits, the panel held that the Clean Water Act does not require that the point source itself convey the pollutants directly into the navigable water. The panel held that the County was liable under the Act because it discharged pollutants from a point source, the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

pollutants were fairly traceable from the point source to a navigable water such that the discharge was the functional equivalent of a discharge into the navigable water, and the pollutant levels reaching navigable water were more than *de minimis*. The panel rejected the argument that the County's effluent injections were disposals of pollutants into wells and therefore exempt from the NPDES permitting requirements.

The panel also held that the Clean Water Act provided fair notice, as required by due process, of what conduct was prohibited.

## COUNSEL

Michael R. Shebelskie (argued), Hunton & Williams LLP, Richmond, Virginia; Colleen P. Doyle, Los Angeles, California; Patrick K. Wong and Richelle M. Thomson, County of Maui, Wailuku, Maui, Hawaii; for Defendant-Appellant.

David L. Henkin (argued) and Summer Kupau-Odo, Earthjustice, Honolulu, Hawaii, for Plaintiffs-Appellees.

David Y. Chung, Thomas A. Lorenzen, Kirsten L. Nathanson, and Mark Thomson, Crowell & Moring LLP, Washington, D.C., for Amici Curiae Association of American Railroads, American Farm Bureau Federation, American Iron and Steel Institute, American Petroleum Institute, National Association of Manufacturers, National Mining Association, The Fertilizer Institute, and Utility Water Act Group.

Shawn Hagerty, Andre Monette, and Rebecca Andrews, Best Best & Krieger LLP, San Diego, California; Roderick E.

Walston, Best Best & Krieger LLP, Walnut Creek, California; for Amici Curiae Association of California Water Agencies, California Association of Sanitation Agencies, California State Association of Counties, International Municipal Lawyers Association, League of California Cities, National Association of Clean Water Agencies, National Association of Counties, National League of Cities, National Water Resources Association, and Watereuse Association.

Frederick H. Turner, R. Justin Smith, and Aaron P. Avila, Attorneys; John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Karyn Wendelowski, Office of General Counsel, United States Environmental Protection Agency, Washington, D.C.; for Amicus Curiae United States.

Nicholas C. Dranias, Assistant Attorney General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Amici Curiae States of Arizona, Alabama, Alaska, Arkansas, Georgia, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Nevada, Oklahoma, South Carolina, Texas, Utah, West Virginia, and Wyoming.

**ORDER**

The Opinion filed on February 1, 2018, is amended as follows:

1. On slip opinion page 12, footnote 2, the following text was added to the end of the footnote: <Hence, it does not affect our analysis that some of our sister circuits have concluded that groundwater is not a navigable water. *See Rice v. Harken Expl.*, 250 F.3d 264, 270 (5th Cir. 2001); *Vill. of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 965 (7th Cir. 1994). We are not suggesting that the CWA regulates all groundwater. Rather, in fidelity to the statute, we are reinforcing that the Act regulates point source discharges to a navigable water, and that liability may attach when a point source discharge is conveyed to a navigable water through groundwater. Our holding is therefore consistent with *Rice*, where the Fifth Circuit required some evidence of a link between discharges and contamination of navigable waters, 250 F.3d at 272, and with *Dayton Hudson*, where the Seventh Circuit only considered allegations of a "potential [rather than an actual] connection between ground waters and surface waters," 24 F.3d at 965.>

2. On slip opinion page 19, footnote 3, the following text was added to the end of the footnote: <Those principles are especially relevant in the CWA context because the law authorizes citizen suits to enforce its provisions. *See* § 1365. Our approach is firmly grounded in our case law, which distinguishes between point source and nonpoint source pollution based on whether pollutants can be "traced" or are "traceable" back to a point source. *See Alaska*, 749 F.2d at 558; *Ecological Rights*, 713 F.3d at 508; *supra*, at 12–15.>

3.  On slip opinion at page 19, the following text replaces the sentence after the citation to *Haw. Wildlife*, 24 F. Supp. 3d at 1000: <Here, the Tracer Dye Study and the County's concessions conclusively establish that pollutants discharged from all four wells emerged at discrete points in the Pacific Ocean, with 64 percent of the wells' pollutants reaching the ocean.  The Study also traced a southwesterly path from the wells' point source discharges to the ocean.>

With these amendments, Judge McKeown voted to deny County of Maui's Petition for Rehearing En Banc.  Judge Schroeder and Judge Nelson recommended denial of petition for rehearing en banc.  The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc.

The petition for rehearing en banc is **DENIED**.  No further petitions for rehearing or rehearing en banc may be filed.

**OPINION**

D.W. NELSON, Senior Circuit Judge:

The County of Maui ("County") appeals the district court's summary judgment rulings finding the County violated the Clean Water Act ("CWA") when it discharged pollutants from its wells into the Pacific Ocean, and further finding it had fair notice of its violations. Hawai'i Wildlife Fund, Sierra Club - Maui Group, Surfrider Foundation, and West Maui Preservation Association ("Associations") urge us to uphold these rulings. For the reasons set forth below, we affirm the district court.

**BACKGROUND**

**1. The Lahaina Wells and the Effluent Injections**

The County owns and operates four wells at the Lahaina Wastewater Reclamation Facility ("LWRF"), the principal municipal wastewater treatment plant for West Maui. Wells 1 and 2 were installed in 1979 as part of the original 1975 plant design, and Wells 3 and 4 were added in 1985 as part of an expansion project. Although constructed initially to serve as a backup disposal method for water reclamation, the wells have since become the County's primary means of effluent disposal into groundwater and the Pacific Ocean.

The LWRF receives approximately 4 million gallons of sewage per day from a collection system serving approximately 40,000 people. That sewage is treated at the Facility and then either sold to customers for irrigation purposes or injected into the wells for disposal. The County disposes of almost all the sewage it receives—it injects

approximately 3 to 5 million gallons of treated wastewater per day into the groundwater via its wells.

That some of the treated effluent then reaches the Pacific Ocean is undisputed.  The County expressly conceded below and its expert confirmed that wastewater injected into Wells 1 and 2 enters the Pacific Ocean.  The Associations submitted various studies and expert declarations establishing a connection between Wells 3 and 4 and the ocean.  Although the County quibbles with how much effluent enters the ocean and by what paths the pollutants travel to get there, it concedes that effluent from all four wells reaches the ocean.

The County has known this since the Facility's inception. The record establishes the County considered building an ocean outfall to dispose of effluent directly into the ocean but decided against it because it would be too harmful to the coastal waters.  It opted instead for injection wells it knew would affect these waters indirectly.  When the Facility underwent environmental review in February 1973, the County's consultant—Dr. Michael Chun—stated effluent that was not used for reclamation purposes would be injected into the wells and that these pollutants would then enter the ocean some distance from the shore.  The County further confirmed this in its reassessment of the Facility in 1991.

According to the County's expert, when the wells inject 2.8 million gallons of effluent per day, the flow of effluent into the ocean is about 3,456 gallons per meter of coastline per day—roughly the equivalent of installing a permanently-running garden hose at every meter along the 800 meters of coastline.  About one out of every seven gallons of groundwater entering the ocean near the LWRF is comprised of effluent from the wells.

## 2.  The Tracer Dye Study

In June 2013, the U.S. Environmental Protection Agency ("EPA"), the Hawaii Department of Health ("HDOH"), the U.S. Army Engineer Research and Development Center, and researchers at the University of Hawaii conducted a study (the "Tracer Dye Study" or "Study") on Wells 2, 3, and 4 to gather data on, among other things, the "hydrological connections between the injected treated wastewater effluent and the coastal waters."  The Study involved placing tracer dye into Wells 2, 3, and 4, and monitoring the submarine seeps off Kahekili Beach to see if and when the dye would appear in the ocean.

The Study concluded "a hydrogeologic connection exists between . . . Wells 3 and 4 and the nearby coastal waters of West Maui."  Eighty-four days after injection, tracer dye introduced to Wells 3 and 4 began to emerge "from very nearshore seafloor along North Kaanapali Beach," near Kahekili Beach Park, about a half-mile southwest of the LWRF.  According to the Study, the effluent travels in this southwesterly path "due to geologic controls that include a hydraulic barrier created by valley fills to the northwest." The Study found "64 percent of the treated wastewater injected into [Wells 3 and 4] currently discharges [into the ocean]." It further concluded "[t]he major discharge areas are confined to two clusters, only several meters wide, with very little discharge [occurring] in between and around them."

Tracer dye from Well 2 was not detected in the ocean. But this was because Wells 3 and 4—located between Well 2 and the areas in the ocean where the wastewater discharges—"inject the majority of effluent," which likely diverted the injected wastewater from Well 2 into taking "a

different path other than directly towards the submarine springs" where the wastewater from Wells 3 and 4 discharges. If Well 2 were to receive most of the effluent at the Facility, that effluent would also take the southwesterly path taken by the wastewater from Wells 3 and 4. And "[b]ecause Well 1 is located in very close proximity to Well 2, . . . the [T]racer [S]tudy's predictions for the fate of effluent from Well 2 can be used to predict the fate of effluent from Well 1," according to the Associations' expert Dr. Jean Moran.

### 3. The District Court's Summary Judgment Rulings

The County appeals three of the district court's summary judgment rulings. In the first, the district court found the County liable as to Wells 3 and 4 for discharging effluent through groundwater and into the ocean without the National Pollutant Discharge Elimination System ("NPDES") permit required by the CWA. *Haw. Wildlife Fund v. Cty. of Maui*, 24 F. Supp. 3d 980, 1005 (D. Haw. 2014). The court based its decision on three independent grounds: (1) the County "indirectly discharge[d] a pollutant into the ocean through a groundwater conduit," (2) the groundwater is a "point source" under the CWA, and (3) the groundwater is a "navigable water" under the Act. *Id.* at 993, 999, 1005.

In its second order, the district court held the County liable as to Wells 1 and 2 based largely on the same reasons it found the County liable on Wells 3 and 4. *Haw. Wildlife Fund v. Cty. of Maui*, Civil No. 12-00198 SOM/BMK, 2015 WL 328227, at *5–6 (D. Haw. Jan. 23, 2015). The court acknowledged that no study confirms the "point of entry into the ocean of flow from [W]ells 1 and 2." *Id.* at *2. But it nonetheless held against the County after "repeatedly

confirm[ing] at the [summary judgment] hearing . . . that the County was expressly conceding that pollutants introduced by the County into [W]ells 1 and 2 were making their way to the ocean." *Id.*

Finally, the district court found the County could not claim a due process violation because it had fair notice under the plain language of the CWA that it could not discharge effluent via groundwater into the ocean.

This appeal followed.

## STANDARD OF REVIEW

The Ninth Circuit "review[s] the district court's grant or denial of motions for summary judgment *de novo*." *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 988 (9th Cir. 2016) (citation and internal quotation marks omitted). "Thus, on appellate review, [the] [Court] employ[s] the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)." *Id.* "As required by that standard, [the Court] view[s] the evidence in the light most favorable to the nonmoving party, determine[s] whether there are any genuine issues of material fact, and decide[s] whether the district court correctly applied the relevant substantive law." *Id.* at 989 (citation omitted).

## DISCUSSION

The Clean Water Act is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this objective, the Act prohibits the "discharge of any pollutant by any person," *id.* § 1311(a), and defines "discharge of a

pollutant" as "any addition of any pollutant to navigable waters from any point source," *id.* § 1362(12) (internal quotation marks omitted). A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any . . . well . . . from which pollutants are or may be discharged." *Id.* § 1362(14) (internal quotation marks omitted). A party who obtains an NPDES permit is exempt from the general prohibition on point source pollution. *Id.* §§ 1311(a), 1342(a)(1). Under these provisions, a party violates the CWA when it does not obtain such a permit and "(1) discharge[s] (2) a pollutant (3) to navigable waters (4) from a point source." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532 (9th Cir. 2001) (citation omitted).

## 1.  Liability under the CWA

The County argues the district court erred in concluding it was liable under the CWA as to all four of its wells. We disagree.

### a.  Point Source Discharges

Neither side here disputes that each of the four wells constitutes a "point source" under the CWA. Given the wells here are "discernible, confined and discrete conveyance[s] . . . from which pollutants are . . . discharged," and the plain language of the statute expressly includes a "well" as an example of a "point source," the County could not plausibly deny the wells are "point source[s]" under the statute. § 1362(14) (internal quotation marks omitted). The record further establishes that from these point sources the County discharges "pollutants" in the form of treated effluent into groundwater, through which the pollutants then enter a

"navigable water[]," the Pacific Ocean.   *See id.*
§§ 1362(7)–(8), (12), (14).   As the pollutants here enter
navigable waters and can be "traced [back] to . . . identifiable
point[s] of discharge," "[the wells] are subject to NPDES
regulation, as are all point sources" under the plain language
of the CWA.  *Trs. for Alaska v. E.P.A.*, 749 F.2d 549, 558
(9th Cir. 1984) (citations omitted).

That the County's activities constitute "point source"
discharges becomes clearer once we consider our
jurisprudence on "nonpoint source pollution": "[Such]
pollution . . . arises from many dispersed activities over large
areas," "is not traceable to any single discrete source," and
due to its "diffuse" nature, "is very difficult to regulate
through individual permits."  *Ecological Rights Found. v.
Pac. Gas & Elec. Co.*, 713 F.3d 502, 508 (9th Cir. 2013)
(citations omitted).  "The most common example of nonpoint
source pollution is the residue left on roadways by
automobiles" which rainwater "wash[es] off . . . the streets
and . . . carrie[s] along by runoff in a polluted soup [to]
creeks, rivers, bays, and the ocean."  *Id.*  Our cases have
consistently held that such runoff constitutes nonpoint source
pollution unless it is later collected, channeled, and
discharged through a point source.  *See, e.g.*, *id.* (citations
omitted); *Envtl. Def. Ctr., Inc. v. U.S. E.P.A.*, 344 F.3d 832,
841 n.8 (9th Cir. 2003) (citation omitted).  Applying these
principles in *Ecological Rights*, we held that rainwater runoff
carrying pollutants from the defendants' utility poles to
navigable waters constituted nonpoint source pollution under
the CWA.  713 F.3d at 509 (citations omitted).

Ours is a different case entirely.  Unlike the "millions of
cars" discussed in *Ecological Rights*, here we have four
"discrete" wells that have been identified and can be

"regulate[d] through individual permits." *Id.* at 508 (citations omitted). Furthermore, the automobiles and the utility poles discussed in *Ecological Rights* did nothing themselves to "discretely collect[] and convey[]" the pollutants to a navigable water, and hence could not constitute "point source[s]" under § 1362(14). *Id.* at 508–10 (citations omitted). The Lahaina Wells, by contrast, collect and inject pollutants in four discrete wells into groundwater connected to the Pacific Ocean, thereby "discretely collect[ing] and convey[ing]" pollutants to a navigable water. *Id.* at 509 (citations omitted); § 1362(14). The Tracer Dye Study confirms this connection as to Wells 3 and 4, and the County conceded as much as to Wells 1 and 2. Given the County knew of these effects well before the LWRF's inception, the record further establishes it "constructed [the wells] for the express purpose of storing pollutants [and] moving them from [the Lahaina Facility] to [the Pacific Ocean]." *Ecological Rights*, 713 F.3d at 509 (citations omitted).[1] This is simply not a case of "nonpoint source pollution . . . caused primarily by rainfall around activities that employ or create pollutants," where the resulting "runoff [can]not be traced to any identifiable point of discharge." *Alaska*, 749 F.2d at 558

---

[1] We do not mean to suggest that a CWA violation requires some form of intent. It does not. *See Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir. 1993) (recognizing CWA "categorically prohibits any discharge of a pollutant from a point source without a permit" (citations omitted)); *accord Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015) (recognizing "regime of strict liability" under the CWA (citation and internal quotation marks omitted)); *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 265 (4th Cir. 2001) (same). But the County's purpose in constructing the wells certainly informs whether they are "conveyance[s]" under the CWA, § 1362(14), and hence, regulable point sources under the statute. *See Ecological Rights*, 713 F.3d at 509 (citations omitted).

(citing *United States v. Earth Scis., Inc.*, 599 F.2d 368, 373 (10th Cir. 1979)).  As the "[County's] activities release[d] pollutants from . . . discernible conveyance[s]" to navigable waters, the County is liable under the CWA.  *Id.* (citations omitted).

### b.  Indirect Discharges

The County contends, however, that under the CWA, it is not sufficient to focus exclusively on the original pollutant source to determine whether an NPDES permit is needed and that how pollutants travel from the original point source to navigable waters matters.  More specifically, the County contends the point source itself must convey the pollutants *directly* into the navigable water under the CWA.  As the wells here discharge into groundwater, and then *indirectly* into the Pacific Ocean, the County asserts they do not come within the ambit of the statute.[2]

---

[2] We assume without deciding the groundwater here is neither a point source nor a navigable water under the CWA.  Hence, it does not affect our analysis that some of our sister circuits have concluded that groundwater is not a navigable water.  *See Rice v. Harken Expl.*, 250 F.3d 264, 270 (5th Cir. 2001); *Vill. of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 965 (7th Cir. 1994).  We are not suggesting that the CWA regulates all groundwater.  Rather, in fidelity to the statute, we are reinforcing that the Act regulates point source discharges to a navigable water, and that liability may attach when a point source discharge is conveyed to a navigable water through groundwater.  Our holding is therefore consistent with *Rice*, where the Fifth Circuit required some evidence of a link between discharges and contamination of navigable waters, 250 F.3d at 272, and with *Dayton Hudson*, where the Seventh Circuit only considered allegations of a "potential [rather than an actual] connection between ground waters and surface waters," 24 F.3d at 965.

The County first cites *Alaska*, where we held that point source pollution occurs when "the pollution reaches the water through a confined, discrete conveyance," regardless of "the kind of pollution" at issue or "the activity causing [it]." *Id.* at 558 (citation omitted). As the effluent here reaches the Pacific Ocean "through" groundwater—a nonpoint source— the County contends it is not liable under the CWA. The County reads *Alaska* out of context. First, we never addressed in *Alaska* whether a polluter may be liable under the CWA for indirect discharges because the issue was not before us. *See id.* Furthermore, when we stated the "pollution [must] reach[] the water through a confined, discrete conveyance," we were merely stating the pollution must come "*from* a discernible conveyance" as opposed to some "[un]identifiable point of discharge." *Id.* (emphasis added) (citations omitted). As the "discharge water [there] [was] released *from* a sluice box, a confined channel within the statutory definition," the activity came within the ambit of the CWA. *Id.* (emphasis added). This case is no different—the effluent comes "from" the four wells and travels "through" them before entering navigable waters. *Id.* It just also travels through groundwater before entering the Pacific Ocean.

A more recent case *Greater Yellowstone Coalition v. Lewis* supports the Associations' contention that the CWA governs indirect discharges. We held there that precipitation flowing into pits containing "newly extracted waste rock," "filter[ed]" hundreds of feet underground, and "eventually entering the surface water" did not constitute point source pollution under the CWA. 628 F.3d 1143, 1147, 1153 (9th Cir. 2010) (citation omitted). The "pits that collect[ed] the waste rock [did] not constitute point sources" because "there [was] no confinement or containment of the [polluted] water"

before it entered navigable waters, as prohibited by the statute. *Id.* We also concluded, however, that precipitation flowing into a "stormwater drain system" before "enter[ing] the ground and, eventually, surface water" constituted a point source discharge—the "stormwater system [was] exactly the type of collection or channeling contemplated by the CWA." *Id.* at 1152.

The wells here are more akin to the stormwater drain system in *Greater Yellowstone* than they are to the pits that collected the waste rock. Unlike the pits that "[did] not constitute points sources within the meaning of the CWA," the wells here "confine[] [and] contain[] . . . the [effluent]" before discharging it "[into] the ground and, eventually, surface water." *Id.* at 1152–53. And it was of no import to us in *Greater Yellowstone* that the pollutants—as here—had to travel through the ground before "eventually, [entering] surface water." *Id.* at 1152. The Court was only concerned with whether there was a point source *from which* the defendant discharged the pollutants. As the stormwater drain system constituted this point source, the Court concluded the defendant was required to "obtain[] the requisite . . . certification for that system." *Id.* at 1153. As the County also discharges its pollutants from a point source, it, too, must obtain an NPDES permit under the CWA.

Our sister circuits agree that an indirect discharge from a point source to a navigable water suffices for CWA liability to attach. In *Concerned Area Residents for Environment v. Southview Farm*, the Second Circuit held "[t]he collection of liquid manure into tankers and their discharge on fields from which the manure directly flows into navigable waters are point source discharges under the case law." 34 F.3d 114, 119 (2d Cir. 1994). Regardless of whether the field itself was

a point source, the court concluded there was a "point source discharge[]" under the CWA because (1) the pollutant itself was released from the tanker, a point source, and (2) there was a "direct[]" connection between the field and the navigable water. *See id.* Both elements are present here. The wells are point sources under the statute, § 1362(14), and the Tracer Dye Study along with the County's concessions establish an undeniable connection between the wells and the Pacific Ocean. The Study establishes effluent injected into the wells travels a southwesterly path from the Facility, appearing in submarine springs only a half-mile away.

Furthermore, in *Sierra Club v. Abston Construction*, the Fifth Circuit recognized that the "ultimate question [as to CWA liability] is whether pollutants [are] discharged from 'discernible, confined, and discrete conveyance(s)' either by gravitational or nongravitational means." 620 F.2d 41, 45 (5th Cir. 1980). It went on to hold that "[s]ediment basins dug by the miners and designed to collect sediment are . . . point sources . . . *even though the materials [are] carried away from the basins by gravity flow of rainwater*." *Id.* (emphasis added). "Gravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the miner *at least initially collected or channeled the water and other materials*." *Id.* (emphasis added). That is what occurred here. The County "initially collected [and] channeled" the pollutants in its wells and injected them into the ground, where they were "carried away from the [wells] by the gravity flow of [ground]water." *Id.* And based on the overwhelming evidence in this case establishing a connection between the wells and the Pacific Ocean, it cannot be disputed the wells are "reasonably likely to be the means by which [the] [effluent] [is] ultimately deposited into a navigable body of water." *Id.* Indeed, the County has known

since the LWRF's inception that effluent from the wells would eventually reach the ocean some distance from the shore. That the groundwater plays a role in delivering the pollutants from the wells to the navigable water does not preclude liability under the statute. *See id.*

The Second Circuit further recognized the indirect discharge theory in *Peconic Baykeeper, Inc. v. Suffolk County*, where it rejected the district court's conclusion that "because the trucks and helicopters discharged pesticides into the air, any discharge was indirect, and thus not from a point source." 600 F.3d 180, 188 (2d Cir. 2010). As the pesticides there were "discharged 'from' the source, *and not from the air*," the court concluded the "spray apparatus . . . attached to [the] trucks and helicopters" constituted a point source under the CWA. *Id.* at 188–89 (emphasis added). The Ninth Circuit has similarly held discharges through the air can constitute "point source pollution" under the statute. *League of Wilderness Def./Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1185, 1192–93 (9th Cir. 2002).

But accepting the County's position—that pollutants must "travel via a 'confined and discrete conveyance'" to navigable waters for CWA liability to attach—would necessarily preclude liability in cases such as *Peconic Baykeeper* and *League of Wilderness*. The pollutants in both cases traveled to navigable waters via the air, and not via the point sources from which they were released. *See Peconic Baykeeper*, 600 F.3d at 188; *League of Wilderness*, 309 F.3d at 1185. Taken to its logical conclusion, the County's theory would only support liability in cases where the point source itself directly feeds into the navigable water—e.g., via a pipe or a ditch. That the circuits have recognized CWA liability

where such a direct connection does not exist counsels against accepting the County's theory.

Indeed, writing for the plurality in *Rapanos v. United States*, Justice Scalia recognized the CWA does not forbid the "'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'" 547 U.S. 715, 743 (2006) (plurality opinion) (emphasis in original) (quoting §§ 1311(a), 1362(12)(A)). He further recognized that "from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates § 1311(a), even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between." *Id.* (emphasis in original) (citations omitted). In support of his "'indirect discharge' rationale," Justice Scalia cited *Concerned Area Residents*, where, as described above, the Second Circuit held the discharge of manure from point sources onto fields (which were not necessarily point sources themselves) and eventually into navigable waters constituted point source discharges under the CWA. *Id.* at 744.

Although the Court in *Rapanos* splintered on other issues, no Justice disagreed with the plurality opinion that the CWA holds liable those who discharge a pollutant from a defined point source to the ocean. Justice Kennedy's opinion concurring in the judgment objected only to the plurality opinion's creation of certain limitations on the Executive Branch's authority to enforce the CWA's environmental purpose and statutory mandate. *Id.* at 778. Similarly, the four-Justice dissent cited the CWA's prohibition of "any addition of any pollutant to navigable waters from any point

source" as strong evidence of the law's wide sweep, and disagreed with the plurality opinion's creation of two limitations on CWA enforcement. *Id.* at 787, 800–06 (Stevens, J., dissenting).

In past cases, we have recognized Justice Kennedy's concurrence in *Rapanos*, not Justice Scalia's plurality opinion, as controlling. But we have only done so in the context of "determin[ing] whether a wetland that is not adjacent to and does not contain a navigable-in-fact water is subject to the CWA." *United States v. Robertson*, 875 F.3d 1281, 1288–89 (9th Cir. 2017) (citations omitted); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 995 (9th Cir. 2007). As this is not a case about wetlands, and we do not decide whether groundwater is a "navigable water" under the statute, we do not apply Justice Kennedy's concurrence here, and consider Justice Scalia's plurality opinion only for its persuasive value, *United States v. Brobst*, 558 F.3d 982, 991 (9th Cir. 2009) (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 81 (1987)) (internal quotation marks omitted). *See S.F. Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 707 (9th Cir. 2007) ("No Justice [in *Rapanos*], even in dictum, addressed the question whether all waterbodies with a significant nexus to navigable waters are covered by the Act.").

Justice Scalia's plurality opinion demonstrates the County is reading into the statute at least one critical term that does not appear on its face—that the pollutants must be discharged "directly" to navigable waters from a point source. As "the plain language of a statute should be enforced according to its terms," we therefore reject the County's reading of the CWA and affirm the district court's rulings finding the County

liable under the Act.  *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015) (citations omitted).

We hold the County liable under the CWA because (1) the County discharged pollutants from a point source, (2) the pollutants are fairly traceable from the point source to a navigable water such that the discharge is the functional equivalent of a discharge into the navigable water, and (3) the pollutant levels reaching navigable water are more than *de minimis*.[3]  The second point in particular is an important one. We therefore disagree with the district court that "liability under the Clean Water Act is triggered when pollutants reach navigable water, *regardless of how they get there*."  *Haw. Wildlife*, 24 F. Supp. 3d at 1000 (emphasis added).  Here, the Tracer Dye Study and the County's concessions conclusively establish that pollutants discharged from all four wells emerged at discrete points in the Pacific Ocean, with 64 percent of the wells' pollutants reaching the ocean.  The Study also traced a southwesterly path from the wells' point source discharges to the ocean.  We leave for another day the task of determining when, if ever, the connection between a

---

[3] The EPA as *amicus curiae* proposes a liability rule requiring a "direct hydrological connection" between the point source and the navigable water.  Regardless of whether that standard is entitled to any deference, it reads two words into the CWA ("direct" and "hydrological") that are not there.  Our rule adopted here, by contrast, better aligns with the statutory text and requires only a "fairly traceable" connection, consistent with Article III standing principles.  *See, e.g.*, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Those principles are especially relevant in the CWA context because the law authorizes citizen suits to enforce its provisions.  *See* § 1365.  Our approach is firmly grounded in our case law, which distinguishes between point source and nonpoint source pollution based on whether pollutants can be "traced" or are "traceable" back to a point source.  *See Alaska*, 749 F.2d at 558; *Ecological Rights*, 713 F.3d at 508; *supra*, at 12–15.

point source and a navigable water is too tenuous to support liability under the CWA.

### c.   Disposals of Pollutants into Wells

Finally, the County contends its effluent injections are not discharges into navigable waters but "disposal[s] of pollutants into wells," and that the Act categorically excludes well disposals from the permitting requirements of § 1342. *See, e.g.*, § 1342(b)(1)(D). As the County urges a "construction that the statute on its face does not permit," we "reject" it here. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 881 (9th Cir. 2001) (citation and internal quotation marks omitted).

The County first relies on § 1342(b), which permits the EPA to delegate CWA authority to "each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction." So long as the State "submit[s] to the Administrator a full and complete description of [its] program" and "a statement . . . that the laws of [the] State . . . provide adequate authority to carry out the described program," the State may "issue [NPDES] permits which[,] [among other things] *control the disposal of pollutants into wells*." § 1342(b)(1)(D) (emphasis added). The County contends based on this language the NPDES permitting requirements do not apply at all to well disposals. Not so. The plain language of the statute clearly permits States to issue NDPES permits for well disposals, and such permits are required only for "discharges into navigable waters." *Id.* § 131242(b); *see also id.* § 1342(a)(1). The provision furthermore makes no judgment about whether a "disposal" always constitutes a "discharge" requiring a NPDES permit. Indeed, only when a "disposal" is also a

"discharge" is a permit required.  *See Inland Steel Co. v. E.P.A.*, 901 F.2d 1419, 1422 (7th Cir. 1990) (noting § 1342(b)(1)(D) "was not intended to authorize [States to] regulat[e] . . . *all* wells used to dispose of pollutants, regardless of absence of any effects on navigable waters" (emphasis in original)).

The County also argues that under § 1342(b)(1)(D), *only the State*, not the EPA, has authority to regulate well disposals.  This Court, however, has already concluded the Act does not "expressly grant[] to the EPA or [the administering] state agency the exclusive authority to decide whether [there is a CWA violation]," even while recognizing § 1342 "suspend[s] the availability of federal NPDES permits once a state-permitting program has been submitted and approved by the EPA." *Ass'n to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1010–12 (9th Cir. 2002) (citing § 1342(c)(1)).  That the administering state agency, HDOH, has "cho[sen] to sit on the sidelines . . . is not a barrier to a citizen's otherwise proper federal suit to enforce the Clean Water Act" and does not somehow "divest [this Court] of jurisdiction" over this case. *Id.* at 1012; *see also Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 949–50 (9th Cir. 2002) ("Under the CWA[,] private citizens may sue any person alleged to be in violation of the conditions of an effluent standard or limitation under the Act or of an order issued with respect to such a standard or limitation by the Administrator of the [EPA] or any state." (citation omitted)).

The County next relies on § 1314(f)(2)(D), which "directs the [EPA] to give States information on the evaluation and control of [nonpoint source] 'pollution resulting from . . . [the disposal of pollutants in wells].'" *S. Fla. Water Mgmt. Dist.*

*v. Miccosukee Tribe of Indians*, 541 U.S. 95, 106 (2004) (citing and quoting § 1314(f)(2)). According to the County, § 1314(f)(2)(D) affirmatively establishes disposals into wells constitute nonpoint source pollution and that it need not obtain NPDES permits under the CWA. But the Supreme Court itself acknowledged in *South Florida* that while § 1314(f)(2) listed a variety of circumstances constituting "nonpoint source[] [pollution]"—including well disposals—the provision "does not explicitly exempt [these] nonpoint pollution sources from the NPDES program *if they also fall within the 'point source' definition*." *Id.* (emphasis added). Consistent with our reading of § 1342(b)(1)(D), the implication here is that well disposals do not *always* constitute nonpoint source pollution. If pollutants from those wells are discharged into a navigable water from a discrete source, that is point source pollution, and the polluter must obtain an NPDES permit if it wants to avoid liability under the CWA. *See* §§ 1311(a), 1342(a)(1).

The CWA's definition of "pollutant" also supports this reading. *See* § 1362(6)(B). Under the Act, "[t]his term [excludes] . . . water derived in association with oil or gas production and disposed of in a well, if [1] the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and [2] such State *determines that such injection or disposal will not result in the degradation of ground or surface water resources*." *Id.* (emphasis added). By contrast, pollutants "disposed of in . . . well[s]" that "alter the water quality" of "surface water[s]" are "subject to NPDES permitting requirements." *N. Plains Res. Council v. Fid. Expl. & Dev. Co.*, 325 F.3d 1155, 1161–62 (9th Cir. 2003) (citing § 1362(6)(B)). Section 1362(6)(B), therefore, confirms that contrary to the County's contentions, the CWA

does not categorically exempt all well disposals from the NPDES requirements. "Were we to conclude otherwise," and create out of whole cloth a categorical exemption for well disposals, we would improperly amend the statute and "undermine the integrity of [the CWA's] prohibitions." *Id.* at 1162 (citation and internal quotation marks omitted). We decline to do so here.

## 2.  Fair Notice

"Due process requires that [a statute] provide fair notice of what conduct is prohibited before a sanction can be imposed." *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) (citation and internal quotation marks omitted). "To provide sufficient notice, a statute . . . must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)) (internal quotation marks omitted). If the "[p]lain [l]anguage of the [s]tatute" is "sufficiently clear to warn a party about what is expected," a court may find the party had "fair notice" under the due process clause. *Id.*; *see also Garvey v. Nat'l Transp. Safety Bd.*, 190 F.3d 571, 584 (D.C. Cir. 1999) (finding the defendant had "fair notice" based on "plain language" of regulation).

In determining whether there has been fair notice, this Court must "first look to the language of the statute itself." *Shark Fins*, 520 F.3d at 980 (citation omitted). Here, the Clean Water Act prohibits the "discharge of any pollutant by any person." § 1311(a). The Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12) (internal

quotation marks omitted).    A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any . . . well . . . from which pollutants are or may be discharged." *Id.* § 1362(14) (internal quotation marks omitted).    Finally, there is an exception to the general prohibition on point source pollution if a party obtains an NPDES permit. *Id.* §§ 1311(a), 1342(a)(1).

It is undisputed the County "add[s] . . . pollutants"—treated effluent—"to navigable waters"—the Pacific Ocean—"from . . . point source[s]"—its four injection wells. *See id.* §§ 1362(6), (12), (14). As its actions fall squarely within the "[p]lain [l]anguage of the [s]tatute," we conclude the County had "fair notice" its actions violated the CWA. *See Shark Fins*, 520 F.3d at 980; *Garvey*, 190 F.3d at 584; *Lee v. Enter. Leasing Co.-West, LLC*, 30 F. Supp. 3d 1002, 1012 (D. Nev. 2014) (finding "reasonable reading of the statute . . . afforded [the] [d]efendants fair notice that their conduct was at risk").

But the County contends it did not have "fair notice" because the statutory text can be fairly read to exclude the wells from the NPDES permit requirements. It argues again that pollution via its wells and the groundwater is nonpoint source pollution not subject to the CWA's prohibitions. Even so, "due process does not demand unattainable feats of statutory clarity." *Planned Parenthood of Cent. and N. Ariz. v. State of Ariz.*, 718 F.2d 938, 948 (9th Cir. 1983) (citation and internal quotation marks omitted).    That there is a "difference[] of opinion" on "the precise meaning of [the CWA]" is "[]not . . . enough to render [it]" violative of the due process clause. *Id.*

The County further contends it did not have "fair notice" because HDOH—the state agency tasked with administering

the NPDES permit program—has maintained an NPDES permit is unnecessary for the wells. The County does not describe HDOH's position accurately. As late as April 2014, HDOH stated in a letter to the County it was still "in the process of determining if an NPDES permit is applicable" to the wells. That HDOH has not solidified its position on the issue does not affirmatively demonstrate it believes the permits are unnecessary, as the County contends. And the fact that the County "has been unable to receive an interpretation of the [CWA] from . . . [HDOH] officials administering the program" is also "[]not . . . enough to render [enforcement of the CWA]" unconstitutional. *Id.* As a "reasonable person would [have] underst[oo]d the [CWA]" as prohibiting the discharges here, enforcement of the statute does not violate the due process clause. *Id.* at 948–49; *see also Shark Fins*, 520 F.3d at 980 (holding liability would attach if "regulation is . . . sufficiently clear to warn a party about what is expected of it" (citation and internal quotation marks omitted)).

## CONCLUSION

At bottom, this case is about preventing the County from doing indirectly that which it cannot do directly. The County could not under the CWA build an ocean outfall to dispose of pollutants directly into the Pacific Ocean without an NPDES permit. It cannot do so indirectly either to avoid CWA liability. To hold otherwise would make a mockery of the CWA's prohibitions. Under the circumstances of this case, we therefore affirm the district court's summary judgment rulings finding the County discharged pollutants from its

wells into the Pacific Ocean, in violation of the CWA, and further finding the County had fair notice of what was prohibited.

**AFFIRMED.**